884 S.W.2d 10 (1994)
In the ESTATE OF Florence E. HAYWARD, Deceased.
Peggy MONROE, et al., Respondents,
v.
Esther L. GIBSON, Pers. Rep. Esther L. Gibson, Indiv., et al., Appellants.
No. WD 48167.
Missouri Court of Appeals, W.D.
July 5, 1994.
Motion for Rehearing and/or Transfer Denied August 30, 1994.
Application to Transfer Denied October 25, 1994.
*11 Charles S. Wilcox, St. Joseph, for appellants.
Jerome Y. Biggs, Jr., Savannah, for respondents.
Before SMART, P.J., and LOWENSTEIN and FENNER, JJ.
Motion for Rehearing and/or Transfer to Supreme Court Denied August 30, 1994.
SMART, Presiding Judge.
This case concerns the degree and type of proof necessary to authorize the imposition of a constructive trust on the proceeds of joint bank accounts following the death of the depositor.
Florence Hayward, a long-time resident of St. Joseph, had been a widow for many years at the time of her death in 1990. She was 92. She had no children, but she had maintained close ties to her siblings, their children, and their grandchildren. Mrs. Hayward lived frugally on a modest income, accumulating personal assets amounting to approximately $550,000.00 at the time of her death.
One of Mrs. Hayward's nieces, Esther Gibson, also resided in the St. Joseph area. Other nieces and nephews resided in other parts of the country. After her husband's death, Mrs. Hayward began titling her assets in joint accounts with Mrs. Gibson. Mrs. Hayward also named Mrs. Gibson, an experienced bookkeeper, personal representative in her will. Thereafter, all of her liquid assets were maintained in survivorship accounts.[1] The only items excluded from such a survivorship arrangement at the time of her death were her personal effects, her house (valued at approximately $34,000.00) and a tract of farm land, all together amounting to approximately $52,000.00 in value. At the time of her death, her bank accounts, bonds, and stock amounted to approximately $500,000.00.
The record discloses nothing as to any estate planning efforts of Mrs. Hayward prior to 1974, apart from the establishment of joint accounts and the fact that she had a will. In 1974, Mrs. Hayward consulted Charles Wilcox, an attorney, concerning her *12 estate plan. Although she had previously made a will, she desired some changes in her estate plan. Mr. Wilcox drafted a will for Mrs. Hayward. Mrs. Hayward indicated at that time that she had an estate consisting of "$90,000.00 plus land." Mr. Wilcox's file notes contain a statement concerning Mrs. Hayward that her "bank accounts, bonds, etc. being placed jointly with Esther, a niece, and she will divide." Esther Gibson was named personal representative in the will. The will left Mrs. Hayward's cut glassware to Mrs. Gibson and gave Mrs. Gibson first pick among all of her jewelry, household goods and personal effects before Mrs. Gibson, in her discretion, distributed the balance to other relatives. The will also provided for a $200.00 special bequest to the widow of a deceased brother of Mr. Hayward, and specially devised 8 acres of rural land to a nephew, Sherman Pettet. The will divided the residuary estate among all her blood relatives. The will provided for one-fourth of the residuary estate to go to each of the surviving families of Mrs. Hayward's four siblings. Esther Gibson, along with each of the seven others in the Lena McCoy branch of the family, was awarded a share equal to 1/32 of Mrs. Hayward's estate. Although Mrs. Hayward adopted revised wills in both 1981 and 1987, the only changes made to the plan of distribution after 1974 related to: (1) changes designed to update the will as to persons deceased, and (2) the change to give Esther Gibson all of Mrs. Hayward's jewelry, personal effects, and household goods. Later wills continued the same plan as to the residuary estate, dividing it among the four branches of the family.
Until late 1987, Mrs. Hayward was quite independent. She handled all of her own financial affairs, meticulously maintaining records of all financial transactions. In those records of her bank accounts are references to Mrs. Gibson as a "co-signer." Esther Gibson then took over Mrs. Hayward's financial affairs as a result of Mrs. Hayward's declining health and alertness. A durable power of attorney was granted to Mrs. Gibson by Mrs. Hayward in May, 1988, after Mrs. Hayward had begun to suffer from Alzheimer's disease. Mrs. Hayward died November 7, 1990, a year or so after being moved from her house to a nursing home. There is no dispute that during the latter years of Mrs. Hayward's life, Mrs. Gibson cared for her extensively, especially for the year or two after the onset of senility until she was moved to a nursing home.
On May 15, 1991, several of the relatives named as beneficiaries in the will filed an action for discovery of assets against Mrs. Gibson. Also joined as defendants were family members of Mrs. Gibson due to the fact that Mrs. Gibson had withdrawn the funds and created co-tenancies in new accounts with her husband and children.[2] The petition included an allegation of a confidential relationship between Mrs. Hayward and Mrs. Gibson, and a claim of undue influence and breach of trust, and requested that the court impose a constructive trust in favor of Mrs. Hayward's estate on the jointly registered assets. The trial court, following a trial, granted the petition for discovery of assets. The bank accounts and savings and loan accounts and the shares of stock were decreed to be a part of the probate estate of Mrs. Hayward, and therefore subject to division under the will dated February 25, 1987.

Findings of the Trial Court
The trial court found that the deceased had maintained continued affection for her siblings and their families, and that she believed in the principle of equal division of an estate between family branches. The trial court also found that she never intended to cut off any branch of her family or to benefit any family member disproportionately. The trial court concluded that Mrs. Hayward intended that her liquid assets be divided by Esther Gibson in accordance with the will, and that the assets were registered in such a way as to avoid probate, and yet to bring them into the hands of Mrs. Gibson so she could carry out the estate plan. The trial court found that Mrs. Hayward intended that Mrs. Gibson receive a 1/32 share of the liquid *13 assets (along with all of Mrs. Hayward's personal effects and household goods) and not the entire value of her liquid assets. The trial court further found that Esther Gibson had been instructed by the decedent that she was to divide the joint assets according to the terms of the will, and that Mrs. Gibson had caused Mrs. Hayward to believe that she would make the division. The court also found that Mrs. Gibson caused the decedent to create survivorship titles in the assets, and to maintain such survivorship titles, in reliance upon such belief. The trial court stated:
The intentions of decedent concerning the ultimate devolution of her estate and property were expressed in her declarations of intention to her attorney and in her various wills, most relevantly her last will, admitted to probate herein. Any expression of decedent's intent which was incidental to the creation of the various joint accounts and joint registrations of title with Esther L. Gibson was not an expression of intent as to the final devolution of the property. Rather it was the expression of intention that the bank, depository or others in control of such property should transfer the property to Mrs. Gibson after decedent's death, in order that Mrs. Gibson would then be able to make a final division and distribution pursuant to decedent's primary expression of intent her will.
(Emphasis added).
The trial court found a confidential relationship existed between Mrs. Hayward and Mrs. Gibson from and after about 1960, and that decedent relied upon Mrs. Gibson to divide the property according to the will. The court found that the wrongful appropriation of the assets by Mrs. Gibson was a constructive fraud, and decreed that all of the jointly held assets are subject to a constructive trust.
On appeal, Mrs. Gibson contends that the trial court misapplied the law because, she argues, absolute ownership of all the survivorship assets vested in Mrs. Gibson by operation of law. She argues that there was no evidence of fraud, undue influence, mistake, or mental incapacity in the opening of the accounts. She argues that the evidence is not sufficient to warrant the imposition of a constructive trust.
Our review of this matter is governed by Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless the trial court has erroneously declared or applied the law. It is undisputed that all of the joint bank and savings and loan accounts come within the terms of § 362.470 RSMo 1986 and § 369.150 RSMo 1986, which govern the disposition of joint accounts in Missouri. The appellants contend that the court erred in determining that the bank accounts and savings and loan account were part of the estate because the applicable statutes vest the accounts in the surviving joint tenant, regardless of the intent of Mrs. Hayward. Appellants make the same argument as to the government bonds[3] and the stock owned by Mrs. Hayward at the time of her death.

The Law of Joint Bank Accounts
The law applicable to joint accounts in Missouri was fundamentally altered in the 1972 decision In re Estate of LaGarce, 487 S.W.2d 493 (Mo. banc 1972). Prior to LaGarce, the survivorship effect of the joint account statutes was that of a rebuttable presumption of common law joint tenancy with right of survivorship. Jenkins v. Meyer, 380 S.W.2d 315 (Mo.1964). If the evidence showed that the depositor intended to retain all beneficial rights during his or her life, then the survivorship rights were defeated even if the depositor intended that the survivor receive the money on the depositor's death. Id.; see also Ison v. Ison, 410 S.W.2d *14 65, 70 (Mo.1967).[4] Since LaGarce it is permissible for a depositor to use a statutory joint account as a will substitute even when the depositor retains beneficial rights during his or her life. Moreover, any party attempting to impose a constructive trust on account proceeds on the basis of the intent of the depositor will be foreclosed from relief, except in cases of fraud, undue influence, mental incapacity or mistake. Id. Key elements of the current law may be summarized as follows:
1. Ownership of joint accounts vests in the account survivor as a matter of law, absent evidence of fraud, undue influence, mental incapacity, or mistake. LaGarce, 487 S.W.2d at 500-501; Section 362.470, RSMo 1986; Section 369.174, RSMo 1986.
2. The joint account statutes dictate that the decedent's intent to pass the funds to the account survivor is conclusively established by an account arrangement which comes within the terms of the statute, subject only to the exceptions mentioned above. Such conclusive effect of the statute is binding not only in a dispute between the financial institution and an account claimant, but also as between the account survivor and another account claimant.[5]Maudlin v. Lang, 867 S.W.2d 514 (Mo. banc 1993). If the account is titled in such a way as to come within the terms of the applicable statute, evidence of the depositor's intent is irrelevant, except in cases of fraud, undue influence, mistake, or mental incapacity. Id. at 516-17.
3. Any co-tenancy arrangement in which the account is payable to either tenant is governed by the joint account statutes. Maudlin, 867 S.W.2d at 516.
4. A party desiring to impose a constructive trust on funds in the hands of an account survivor on the basis of fraud must produce an "extraordinary degree" of proof. Fix v. Fix, 847 S.W.2d 762, 765 (Mo. banc 1993). Such party must show that there was actual fraud or constructive fraud by evidence that is so "clear, cogent, and convincing as to exclude every reasonable doubt in the mind of the trial court." Id. Generally, it is essential in such a case to show that the decedent made disposition of the property in question in reliance upon an agreement, express or implied,[6] to handle the money in a certain fashion, and a subsequent breach of that agreement. Id. at 767.
In this case, the joint accounts in question come within the terms of the statute. There is no evidence that the joint accounts were established as a result of undue influence or mental incapacity. Further, there is no evidence of any "mistake" which justifies avoiding the survivorship effect of the accounts. See Estate of Hysinger, 785 S.W.2d 619, 623-26 (Mo.App.1990); Maudlin, 867 S.W.2d at 518. We are left with the issue of whether the trial court correctly applied the law in imposing a constructive trust on the basis of fraud.

The Evidentiary Standard
Missouri law as to the imposition of a constructive trust in such situations is discussed in Fix v. Fix, 847 S.W.2d 762 (Mo. banc 1993). In that case, the decedent had created joint and survivorship accounts valued *15 at $132,000.00 which named her sister, Billie, as a joint tenant, in 1964. The decedent also had three brothers, Frank and two others. The decedent had executed a will which apparently purported to distribute the decedent's assets among all of her siblings. Frank was named personal representative. Frank testified that the decedent had told him that she placed Billie's name on the joint account to avoid probate. Frank testified that the decedent said she trusted Billie and believed that Billie would divide the money in accordance with the will. He said that the decedent had said on several occasions that she trusted Billie to "do the right thing." According to the testimony of Frank's wife, Mary, the decedent refused to place the names of any of the brothers on the joint accounts because she did not want Billie to think that she did not trust her. Mary said the decedent also told her that she (the decedent) trusted Billie to divide the accounts equally. The decedent, according to Mary, said that Billie knew that was what the decedent wanted done. Mary and her daughter both also testified that, after the funeral of the decedent, Billie said, "everyone thinks that I am going to cheat them, but they are going to get their money." In addition to the joint accounts naming Billie as co-tenant, there were four joint certificates of deposit in the names of the decedent and Billie, and seven joint certificates in the names of the decedent and other siblings.
The trial court found that Billie enjoyed a confidential relationship with the decedent with the understanding that Billie would divide the money. The trial court imposed a constructive trust. The Supreme Court reversed the trial court.
Viewing the evidence in the light most favorable to the verdict, the evidence is not sufficiently clear, cogent and convincing so as to exclude every reasonable doubt that Billie accepted the designation of joint tenancy knowing of Catherine's [the decedent's] intent. The strongest evidence to support the trial court's finding of a "promise" by Billie to Catherine is Catherine's alleged statement to Mary Fix that Billie knew what Catherine wanted done. If admitted and believed, however, the statement does not constitute clear, cogent, and convincing evidence of an agreement by Billie to divide the money with the brothers, or show that Catherine created or maintained the joint tenancy in reliance on Billie's promise to divide the money with the brothers. . . Absent clear, cogent and convincing evidence of an agreement or understanding by Billie upon which Catherine relied so as to make disposition of her property by joint accounts with right of survivorship, there is insufficient proof to allow a finding of constructive fraud.

Without proof of fraud, the titling of the account in Billie's name as a joint tenant with right of survivorship is conclusive evidence of Catherine's intent that the accounts vest in Billie upon Catherine's death.
Id. at 768 (citations omitted) (emphasis added).
The Fix case makes clear that claims of constructive fraud will require an extremely high standard of proofa standard requiring clear, cogent and convincing evidence excluding every reasonable doubt that the co-tenant accepted the designation of joint tenancy knowing of the depositor's intent that the proceeds be handled in a fiduciary capacity upon the death of the depositor. The court regarded the self-serving and self-interested testimony of Frank, Frank's wife (Mary) and Frank's daughter as falling short of being "clear, cogent and convincing." The court also found the references to Billie knowing "what Catherine wanted" were vague rather than clear. Moreover, it appeared that the deceased used joint tenancy arrangements with various beneficiaries as a testamentary device, which would make it seem more likely that she intended the same thing with regard to Billie. The court thus refused to impose a trust. The court regarded the evidence of an express or implied promise as less than "clear, cogent and convincing."
In the case before us, our careful review of the findings and conclusions of the trial court fails to confirm that the trial court applied the Fix standard of "clear, cogent and convincing evidence" as to the breach of *16 trust. It is clear that the trial court had absolutely "no doubt" as to what Mrs. Hayward intended; it is not quite as clear that it applied the same standard in the finding that Mrs. Gibson implicitly or explicitly agreed to "divide" the funds in accordance with the will. Rather than have us remand to the trial court, however, Mrs. Gibson contends on this appeal that, in any event, the evidence in the trial court was, as a matter of law, insufficient to constitute clear, cogent, and convincing evidence that Mrs. Gibson breached any implied promise. In order to evaluate this contention, we must examine the evidence with an eye to determining whether, viewed in the most favorable light, the evidence could reasonably be considered as rising to the level of being so "clear, cogent and convincing" as to justify the imposition of a constructive trust.
In 1974, when Mrs. Hayward executed her will, she divided her estate into four shares one share for each of her siblings. She then further divided each of the four shares according to the number of descendants of each of the siblings. She and her attorney discussed the effect of joint account ownership, according to the attorney. She understood that the joint account property does not pass under the will but instead is paid directly to the account survivor. The note in Mr. Wilcox's 1974 file reveals that she was planning to make intentional use of joint ownership to avoid probate: "bank accounts, bonds, etc., being placed jointly with Esther, a niece, and she will divide." In both 1981 and 1987, Mrs. Hayward came back to Mr. Wilcox to make minor changes to update the wills. The last will interview with Mr. Wilcox occurred only shortly before Mrs. Hayward began experiencing the effects of Alzheimer's disease. The interview concerning the power of attorney occurred after she had begun to experience a decline in her faculties due to the disease, but while, presumably, she was still competent to execute the document.
Another niece of Mrs. Hayward, Bonnie Stiffler, also testified that Mrs. Hayward stated in later years of her life that she intended for her estate to go to her brothers and sisters and to their children, and that Mrs. Hayward said that she trusted Mrs. Gibson "to do the right thing." There was no indication that Mrs. Gibson was present during any such comments.

Evaluating the Evidence
Mrs. Gibson states that Mrs. Hayward never expressed to her any intention concerning what Mrs. Gibson should do with the funds after Mrs. Hayward's death. Based upon Mrs. Hayward's 1974 statement to her attorney, we may conclude that Mrs. Hayward had been counting on Mrs. Gibson since 1974, or earlier, to divide the funds. In 1974, Mrs. Hayward was apparently confident Mrs. Gibson would "divide the funds." We do not, however, know the precise basis of Mrs. Hayward's confidence that Mrs. Gibson would divide the funds. The statement that Mrs. Gibson would divide the funds could conceivably have been based on mere hope or assumption that Mrs. Gibson would divide the funds, rather than on any communication. Under the standard of the Fix case, there must be clear, unquestionable evidence of a breach of trust on the part of Mrs. Gibson. "To establish a constructive trust, an extraordinary degree of proof is required. The evidence must be unquestionable in character. The evidence must be so clear, cogent and convincing as to exclude every reasonable doubt in the mind of the trial court." 847 S.W.2d at 762. Given that standard, we conclude that the trial court could not reasonably have had the requisite degree of certainty that such a communication actually took place. We conclude a remand for additional findings is unnecessary.

Express or Implied Promise
We do not disagree with the trial court's conviction that Mrs. Hayward intended that Mrs. Gibson divide the money in accordance with the will. If this case were about Mrs. Hayward's intent, there would be abundant evidence to affirm the trial court. But there is a difference between determining Mrs. Hayward's intent and determining whether constructive fraud has been proven. The Missouri Supreme Court has made clear that it will not enforce the actual intent of the depositor in statutory joint bank account cases, even when that intent is known, except in the case of the specified exceptions. Maudlin v. Lang, 867 S.W.2d 514 (Mo. banc *17 1993). As to the fraud exception, the law will not enforce the will of the depositor except where there is clear proof of an express or implied promise by the account survivor which has been breached. Fix, 847 S.W.2d at 768.
An implied promise was found in Thompson v. Williams, 671 S.W.2d 442 (Mo.App. 1984). In that case, the decedent was survived by two brothers, two sisters and a brother-in-law. They were all named as beneficiaries of her will. In the last year of her life, the decedent created several joint accounts and certificates in joint names with her younger brother, Lindsay, Sr. She executed a general power of attorney in favor of Lindsay, Sr., and executed a deed placing real estate in joint ownership with Lindsay, Sr. Lindsay, Sr. had also been designated as executor of her estate. The court in that case found that there was evidence to support the inference and conclusion that the transfers into joint tenancy were made to enable him to manage her investments for her. There was also evidence that she transferred real estate into co-ownership to facilitate Lindsay, Sr.'s management of those properties. The court said:
Of particular interest is a recurring theme throughout all the testimony of [the decedent's] discussion of her property passing to her relatives under her will and her references to Lindsay, Sr. as the executor. A reading of the transcript leaves the clear conclusion that [the decedent] viewed Lindsay, Sr.'s activities as executor to begin during her life when he began the management of her assets and that the transfer into joint names was a pre-death placement of her assets into his hands in his capacity as executor of her estate. Lindsay, Sr.'s testimony leaves a similarly clear conclusion that he understood that to be [the decedent's] belief and intent. He is deemed to have accepted the transfers on that basis.
Id. at 444-455 (emphasis added).
The facts of Thompson come close to those of this case. In this case, however, Esther Gibson never conceded that she understood Mrs. Hayward's intent to be that the funds should be divided. See also Estate of Murray, 865 S.W.2d 694 (Mo.App.1993). We also must note that Thompson was decided prior to Fix, and that the court in Thompson never mentioned the standard of clear, cogent, and convincing evidence which was articulated in Fix. We conclude that under Missouri law as set forth and applied in Fix and Maudlin, the evidence is not sufficient to warrant a finding of constructive fraud on the part of Mrs. Gibson. Although this result may appear to violate the actual intent of Mrs. Hayward as found by the trial court, this court finds the result compelled by binding precedent.
When it comes to the actual intent of a decedent as expressed in a duly executed will, the law honors such intent as virtually sacrosanct. In contrast, under the joint account statutes of Missouri, as construed since LaGarce, the actual intent of a deceased depositor is disregarded. Maudlin v. Lang, 867 S.W.2d 514 (Mo. banc 1993). Even when there has been an understanding between a depositor and the co-tenant as to the disposition of the funds, such understanding may be difficult to prove to the necessary degree of certainty after the death of the depositor. Therefore, the depositor in such cases, whether wittingly or unwittingly, leaves matters to the integrity and sense of honor of the account survivor.
Survivorship accounts should not be regarded as offering a form of enforceable personal trust. Nor should they be used as a substitute for a limited power of attorney, authorizing a designee to make deposits and withdrawals for the depositor. Prior to the LaGarce decision in 1972, the law of joint accounts was in great confusion, and injustice sometimes resulted as the survivorship feature of accounts was not enforced even though the depositor may have intended for survivorship to operate. LaGarce, 487 S.W.2d at 499-500; see Jenkins v. Meyer, 380 S.W.2d 315 (Mo.1964). LaGarce brought some certainty to the law, and allowed the use of joint accounts as a testamentary vehicle. LaGarce, however, brought a different set of problems. Currently, injustice may result from the creation of an account legally deemed to be a survivorship account, where the depositor either did not intend such feature or did not understand the consequences thereof. Matter of Estate of Hysinger, 785 S.W.2d 619, 623-26 (Mo.App.1990); Maudlin, 867 S.W.2d at 518. Also, injustice may result *18 in cases where the depositor does intend a survivorship feature, but also intends that the account survivor receive such funds in trust and disburse them to others. As long as the law of joint accounts retains its present posture, depositors and their advisors will do well to make sure that the consequences and dangers of joint accounts are understood.

Conclusion
We reverse the judgment of the trial court imposing a trust on the proceeds of the accounts, bonds, and stock. We remand this case to the trial court with instructions to dissolve all orders imposing a trust on the liquid assets derived from the jointly titled assets, and to enter judgment for the defendants.[7] Each party shall bear its own costs on appeal.
All concur.
NOTES
[1] Some of the United States Savings Bonds were "pay on death" bonds designating Esther Gibson as the beneficiary. All other assets were some form of joint and survivorship account.
[2] For the sake of convenience, Mrs. Gibson and the other defendants-appellants may sometimes be referred to jointly as "Mrs. Gibson."
[3] The disposition of the government bonds is apparently governed by regulations of the Treasury Department contained in Dept. Circular, Public Debt Series No. 3-80, appearing in 31 C.F.R. §§ 353.5 and 353.49 (1988). These regulations recognize the surviving co-owner as the "sole and absolute owner" of the bonds. The parties treat these regulations as applicable, and as having the same effect as the Missouri joint account statutes, so we do likewise.
[4] In this case, some of the accounts were created prior to the decision in LaGarce. However, no argument has been made that pre-LaGarce law should apply to these accounts. We therefore treat all accounts as though they are governed by the law since LaGarce.
[5] The trial court in this case erred in its interpretation of the joint account statutes. It regarded the statutes as designed only to exonerate the depository institutions, but not to control the ultimate disposition of such account proceeds. However, the statutes do control the ultimate disposition of the proceeds also, except in cases of fraud, undue influence, mental incapacity or mistake. LaGarce, 487 S.W.2d at 501. The trial court's erroneous understanding of the effect of the statutes is not dispositive since the court went on to specifically find that Mrs. Gibson was guilty of constructive fraud, which is a basis for taking the accounts outside the effect of the statutes. Therefore, this appeal focuses on the issue of constructive fraud.
[6] An implied agreement might be held to occur, for instance, where the depositor instructs a person named as a co-tenant to divide the funds in accordance with the terms of the will upon the depositor's death, and the silence of the co-tenant leads the depositor to believe that the co-tenant has agreed to such a plan. See Thompson v. Williams, 671 S.W.2d 442 (Mo.App.1984).
[7] The judgment included an award to plaintiffs in the sum of $940.47 against Esther L. Gibson for suit expenses. This award was not challenged on appeal, and therefore remains intact.